IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RONDA SUE MEYER, | ) | CASE NO. 3:20CV921 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Ronda Sue Meyer ("Meyer") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.

As set forth more fully below, the Administrative Law Judge failed to fully evaluate whether Meyer's impairments met or equaled Listing 1.04A. Accordingly, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

Meyer protectively filed an application for DIB on July 24, 2017, alleging a disability onset date of August 19, 2015. Tr. 11. She alleged disability based on the following: back injury, radiculopathy at L4-L5 and L5-S1, and depression. Tr. 623. After denials by the state agency initially (Tr. 487) and on reconsideration (Tr. 501), Meyer requested an administrative hearing. Tr. 519. A hearing was held before an Administrative Law Judge ("ALJ") on March 8, 2019. Tr. 440. In his April 1, 2019, decision (Tr. 11-25), the ALJ determined that there are jobs

that exist in significant numbers in the national economy that Meyer can perform, i.e., she is not disabled. Tr. 23-24. Meyer requested review of the ALJ's decision by the Appeals Council (Tr. 575) and, on March 12, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Meyer was born in 1969 and was 46 years old on the alleged onset date. Tr. 23. She graduated from high school and attended a technical school for a few semesters. Tr. 447. She previously worked as a security officer, a fry cook, and a locator of gas lines. Tr. 448-453.

### B. Relevant Medical Evidence[1]

On June 26, 2014, Meyer saw neurologist Dr. Mohamed, M.D., for an EMG of her bilateral lower extremities. Tr. 718-719. Dr. Mohamed wrote a letter explaining that Meyer had fallen at work in December 2013, hurt her left hip and back, and experienced pain down her left leg to her foot, as well as numbness, tingling, and a burning sensation. Tr. 712, 718. The study showed evidence of left sided, chronic lumbar radiculopathy at L4-L5.

On September 3, 2014, Meyer returned to Dr. Mohamed. Tr. 712. He noted that hip x-rays and a lumbar MRI from January 2014 had been unremarkable. Meyer stated that she felt that her legs gave out on her and she was using a cane. She was seeing a chiropractor, she had been told by another doctor that she was not a surgical candidate, and she had not, thus far, been approved for pain management. Upon exam, her low back showed stiffness with decreased bending and she had a mildly positive straight leg raise test on the left. She had some give away weakness in her left lower extremity, her strength was otherwise normal, and her deep tendon

---

[1] Meyer only challenges the ALJ's decision regarding her physical impairments. Doc. 21, p. 4. Therefore, only Meyer's physical impairments will be summarized and discussed herein.

reflexes were reduced at the left knee and normal everywhere else.  She had a slow, but stiff, gait.  Dr. Mohamed increased her Cymbalta; she was also taking Mobic and Flexeril.

On December 15, 2014, Meyer saw Dr. Mohamed for a follow up.  She reported that her medications had been helpful for her quality of life and activities of daily living.  She stated that her twice-a-week chiropractic visits were also helpful.  Upon exam, she had stiffness in her lumbar spine, her motor exam was "unchanged," her deep tendon reflexes were symmetric, and she had a steady gait.  She was to continue her medications.

On January 14, 2015, Meyer had a lumbar spine MRI, which showed a broad-based disc bulge at L4-L5 which minimally indented the anterior thecal sac, causing mild canal stenosis, and mild bilateral neural foraminal stenosis.  Tr. 731-732.

On February 18, 2015, Meyer saw Dr. Mohamed.  Tr. 707.  Her treatment regime was working and she had no complaints of weakness, numbness or tingling.  Upon exam, she had low back stiffness with decreased bending, "fairly good strength," symmetric reflexes and a steady gait.  On March 24, she reported that Voltaren gel "has been very helpful to her as well."  Tr. 706.  Her Norco was helping "a lot" with her quality of life and daily activities and she was trying to work 40 hours a week.  Upon exam, she had some stiffness in her lumbar spine and mildly reduced range of motion.  She had good strength in her arms and legs with normal tone and bulk, symmetric reflexes, and a steady gait.

On April 14, 2015, Meyer saw Dr. Mohamed complaining of severe pain.  Tr. 705.  She was taking Zanaflex and using Voltaren gel.  Upon exam, she had some tenderness in her lumbar spine with increased range of motion, especially bending.  She had good strength in her arms and legs with normal tone and bulk, symmetric reflexes, and a steady gait.  Dr. Mohamed gave her Percocet and requested approval for trigger point injections and a pain management consultation.

3

On April 28, Meyer told Dr. Mohamed that her hip pain was so severe that she had to go to the emergency room. Tr. 704. They gave her medication and she was feeling somewhat better, but the combination of working 40 hours a week with no chiropractic care made her symptoms worse. Dr. Mohamed added Gabapentin and stated that she can continue to see her chiropractor. Upon exam, she had low back stiffness with decreased bending, fairly good strength in her arms and legs, symmetric reflexes, and a steady gait.

On May 3, 2015, Meyer saw Dr. Mohamed reporting low back and hip pain. Tr. 702. Dr. Mohamed stated that he was reluctant to continue to prescribe her medications. He suggested stretching and low impact home exercises. Her exam findings were as before, except she showed mild give away weakness in her legs due to pain. Dr. Mohamed continued her medications. On May 14, Meyer returned to Dr. Mohamed. Tr. 703. Her medications were helpful. She had no weakness in her legs upon exam. She also complained of ankle swelling, which she did not have upon exam, and which Dr. Mohamed encouraged her to speak to her primary care physician about.

On June 16, 2015, Meyer saw Dr. Mohamed. Tr. 701. She had been approved to visit pain management, she was seeing her chiropractor twice a week, which helped with her stiffness and spasms, she was on Cymbalta, Flexeril, Gabapentin, and using Voltaren gel. She reported that her pain was "much better" because she was mostly working from home and had not been doing as much. Dr. Mohamed advised she stay off narcotics. Upon exam, she had mild stiffness in her lumbar spine with decreased range of motion, no significant weakness, symmetric reflexes, and a steady gait. On July 20, Meyer told Dr. Mohamed that she had stopped taking her Gabapentin because it caused episodes of "spacing out" and she had received epidural injections from pain management which made her pain worse. Upon exam, she had mild stiffness in her

4

low back with a mildly decreased range of motion, good strength in her extremities, symmetric reflexes, and a steady gait.

On October 5, 2015, Meyer had a second EMG of her bilateral lower extremities. Tr. 716-717. The result was the same as her prior EMG. At a follow up with Dr. Mohamed on October 13, she reported that her pain management doctor suggested a surgical consult, to which Dr. Mohamed agreed. Tr. 699. Upon exam, she had low back stiffness with 15% extension, flexion, and lateral rotation, no significant weakness, symmetric reflexes, and a steady gait.

On January 21, 2016, Meyer saw Dr. Mohamed for a follow up. Tr. 698. She was taking her medications and advised that she had been scheduled for surgery in February. That day she reported "doing well." Upon exam, she had low back stiffness with 20% extension, flexion, and lateral rotation, good strength in her arms and legs, normal reflexes, and a steady gait.

On February 24, 2016, Meyer had an L4-L5 foraminotomy performed by Dr. Gaudin, M.D. Tr. 723.

On May 13, 2016, Meyer saw Dr. Gaudin. Tr. 814. Her surgery had not relieved her symptoms, and Dr. Gaudin was to perform another surgery. Tr. 811. Meyer reported that she had recently experienced difficulty with incomplete bladder emptying. Tr. 816. Upon exam, she had decreased motor strength, 4/5, in her left hip, left knee quadricep, and left ankle; decreased sensation of her left leg; and an antalgic gait. She had an L4-L5 laminectomy and fusion on May 23, 2016. Tr. 725. Due to persistent post-operative pain, she was hospitalized until June 1, 2016. Tr. 725. She also received a hip injection on May 31, which did not help her left hip pain.

On June 7, 2016, Meyer saw Dr. Gaudin for her first follow up. Tr. 809. She reported pain in her left hip, left leg and back, swelling in her left leg, and weakness, numbness and dizziness. Tr. 810. On July 1, she had a second follow up appointment. Tr. 805. Upon exam,

5

she had full motor strength in both hips, both knee quadriceps, both ankles, and both feet. Tr. 807. She had decreased sensation in her left leg and foot. She had an antalgic gait and ambulated with a cane.

On June 30, 2016, Meyer returned to Dr. Mohamed. Tr. 697. She reported that she had had two surgeries, she was still having low back pain and a feeling like bee stings on her left leg, and no numbness or tingling. She had a lot of pain in her left big toe. She was taking Lyrica, which helped, and she was wearing a "huge" brace on her lower back. She had no bladder complaints. Dr. Mohamed did not want to take off her brace to examine her back, but, otherwise, he noted that she had fairly good strength in her arms and legs and normal deep tendon reflexes. He wrote, "She walks with a good gait actually on her own, but she also has a walker to use for balance." He refilled her Lyrica.

On August 26, 2016, Meyer returned to Dr. Mohamed. Tr. 696. Upon exam, she had a decreased range of motion in her low back (she was still wearing the brace, but it was removed for her exam); some give-away weakness of her bilateral legs, more so on the left because of pain; reduced left knee jerk; and her gait was stiff and she used a cane.

On September 28, 2016, Meyer visited pain management and saw Dr. Atallah, M.D. Tr. 794. She reported muscle aches, weakness, joint pain, back pain, and swelling in her left leg. Tr. 797. Upon exam, she had an antalgic gait and did not use an assistive device. Her motor strength was 5/5 except for 4/5 in her left ankle and left great toe. On her left leg, she had a positive Patrick-Faber test and straight leg raise tests in the supine and seated positions. Tr. 798. She had decreased sensation in her left leg and diminished reflexes in her ankles and knees. Dr. Atallah recommended injections.

On October 5, 2016, Meyer returned to Dr. Atallah. Tr. 791. She described her pain as

sharp, currently 5/10 and 9/10 at worst, and interfering with her sleep and work.  Upon exam, she had tenderness of her lumbar spine and left hip, a reduced, painful range of motion in her lumbar spine, diminished reflexes in both knees and ankles, and, in her left leg, diminished sensation, a positive Patrick-Faber test, and positive straight leg raise testing in the supine and seated positions.  Tr. 793-794.  She had an unassisted, antalgic gait.

On October 20, 2016, Meyer returned to Dr. Mohamed.  Tr. 695.  She was taking Lyrica with some relief.  Upon exam, she had a decreased range of motion in her lumbar spine, mild give-away weakness in her legs due to pain, reduced left ankle jerk, and a stiff but steady gait.  Her Lyrica prescription was refilled.

On March 8, 2017, Meyer saw Dr. Mohamed for a third EMG of her lower extremities.  Tr. 714-715.  The study showed evidence of chronic, bilateral lumbar radiculopathy at L4-L5 and L5-S1.

In November 2017, Meyer had a lumbar MRI showing her lumbar surgical hardware in normal alignment, normal disc space height, and no disc herniation or spinal stenosis.  Tr. 919.

On April 18, 2018, Meyer saw Dr. Atallah.  Tr. 1207.  Upon exam, she had decreased range of motion in her lumbar spine, normal muscle strength, diminished reflexes in her knees and ankles, diminished sensation in her left leg, and a positive Patrick-Faber test bilaterally and positive straight leg raise testing on the left.  Tr. 1209.  On May 16, her exam was as above, except that she only had a positive Patrick-Faber test on the left.  Tr. 1203.  On June 11, her reflexes and sensation were normal and she had a negative Patrick-Faber test.  Tr. 1200.

On August 7, 2018, Meyer underwent a spinal cord stimulator trial with Dr. Atallah.  Tr. 1193.  A week later, the stimulator was removed because it was not relieving pain, despite the manufacturer making changes to the programming of the device.  Tr. 1189.

7

On September 10, 2018, Meyer saw Dr. Atallah complaining of increased pain.  Tr. 1186.  Upon exam, she had diminished motor strength, 4/5, diminished reflexes in her knees and ankles, diminished sensation in her left leg, and a positive straight leg raise test on the left.  Tr. 1188.

On October 1, 2018, Meyer had a lumbar MRI which showed no central canal stenosis, mild bilateral neuroforaminal encroachment at L3-L4 and L5-S1, and mild to moderate bilateral neuroforaminal encroachment at L4-L5.  Tr. 1181-1182.

On October 5, 2018, Meyer saw Dr. Atallah for a follow up.  Tr. 1178.  She reported increased pain with flexion, extension, lifting, twisting, standing, walking, and getting out of bed.  Tr. 1179.  Her exam findings were as her prior visit, except that she had a positive Patrick-Faber test on the left.  Tr. 1180.

On November 28, 2018, Meyer returned to Dr. Atallah complaining of right-sided pain after a fall on Thanksgiving.  Tr. 1301.  Upon exam, her motor strength was normal, her sensation was normal, she had a negative Patrick-Faber test, and a positive straight leg raise test bilaterally.  Tr. 1303.

**C. Opinion Evidence—State Agency Reviewing Physicians**

On September 5, 2017, state agency reviewing physician Dr. Siddiqui, M.D., reviewed Meyer's record.  Regarding her RFC assessment, Dr. Siddiqui opined that Meyer could perform a reduced range of light work: she could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, and could stand/walk for six hours and sit for six hours out of an eight-hour workday.  She could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl.  Tr. 481-482.  On December 29, 2017, state agency reviewing physician Dr. Hughes, M.D., affirmed Dr. Siddiqui's opinion.  Tr. 494-496.

**D. Testimonial Evidence**

8

**1. Meyer's Testimony**

Meyer was represented by counsel and testified at the administrative hearing. Tr. 439. She testified that she lives with her husband, daughter, and 2-year-old granddaughter. Tr. 446. She has a driver's license and occasionally drives. Tr. 446-447. She has trouble driving long distances due to sitting in place for so long but can drive short distances. Tr. 447, 464. She assists with the care of her granddaughter but does not care for her by herself; there is always someone at home with her. Tr. 447.

Meyer explained that she used to work in the field as a gas line locator, and, when she injured herself in a fall while working, she was given light duty work which she performed from home. Tr. 449-450, 454. When asked about what was going on in the summer of 2015 and how her ability to work was impacted, Meyer explained that she was fine working from home because she was able to prop her feet up on the chairs at her kitchen table while working on a computer. Tr. 454. At that time, she was unable to do housework; she just sat at the kitchen table and chairs, and then, when her work was done, she sat in a recliner, which is the most comfortable. Tr. 454, 465. She tries to keep her legs elevated because her left foot and leg go numb and her foot swells when she sits in a regular chair. Tr. 454.

Meyer confirmed that she had lumbar surgery in 2016 performed by Dr. Gaudin. Tr. 454. When asked whether Dr. Gaudin ever released her to go back to work after that surgery, Meyer stated that he did not. Tr. 454. She had to have another lumbar surgery a few months after the first. Tr. 455. The first surgery was to cut away bone at the nerve canal because she had a lot of pinched nerves. Tr. 455. It was unsuccessful, so they did a laminectomy, where they insert metal to stabilize her back at L4-5. Tr. 455. The second surgery was not helpful. Tr. 455. She had to stay in the hospital for 7-8 days afterwards because she was in so much pain and unable to

9

function on her own. Tr. 455. She had had a CT scan of her back after her second surgery to see if a problem could be identified, but the scan showed no abnormalities. Tr. 455.

Meyer admitted that, after her second surgery, she had tested positive for marijuana use. Tr. 456. She explained that her pain management doctor would not prescribe her pain medication. Tr. 456. At that time, she was using marijuana about three times a day. Tr. 456. She stopped using it shortly after seeing Dr. Atallah. Tr. 456. When asked to explain why a drug test failed to show Percocet when she was supposed to have been taking it, she explained that she had run out of Percocet at the time of the drug test because she had previously taken more than prescribed due to pain. Tr. 460. She had tried aquatic therapy for pain but it did not help. Tr. 456. It made her back hurt worse, so they suggested she see pain management and then resume therapy. Tr. 456. She had had a spinal cord stimulator implanted for a 5-day trial, but it caused more pain so it was removed. Tr. 458. She was told to do regular exercises in the form of stretching, but she does not do that because when she tries it hurts worse. Tr. 459-460.

The ALJ asked Meyer to explain medical record notations indicating that she had reported that she was taking care of her granddaughter. Tr. 457. Meyer maintained that she never told anyone that she took care of her granddaughter by herself. Tr. 457-458. She is able to wash dishes, which involves standing for 10 minutes at a time. Tr. 458. She stated that it is very hard for her to get around and do things. Tr. 460. It is very discouraging when every time she does something her back doesn't work. Tr. 460. When asked how far she can walk, Meyer explained that it depends; some days she can walk for five minutes, other days two minutes, and other days she is already in pain when she gets up. Tr. 460. She can't walk very much without limping, and then, on Thanksgiving, she fell. Tr. 461. As a result of that fall, she had more pain in her right leg, which had been her good leg. Tr. 461. She estimated that she could sit for about

10

20 minutes, she does not push or pull with her arms or legs, and she can't lift anything heavier than a gallon of milk.  Tr. 462.  She can bend, squat and crawl with pain and she is able to climb stairs, but she is unable to step up with her left leg.  Tr. 462.  She can reach her arms above her head to a degree; a shoulder impingement inhibits certain movements.  Tr. 462.  She can grasp and manipulate objects with her fingers.  Tr. 462.  She does not shop for groceries; her daughter and husband do that.  Tr. 463.  She has problems sleeping due to pain.  Tr. 463.  She estimates that she lies in her recliner chair 8-10 hours a day.  Tr. 465.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  The ALJ discussed with the VE Meyer's past relevant work.  Tr. 467.  The ALJ asked the VE to determine whether a hypothetical individual of Meyer's age, education, and work background could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below.  The VE answered that such an individual could not perform Meyer's past work but could perform the following jobs with significant numbers in the national economy: checker, routing clerk, and mail clerk.  Tr. 469.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

11

the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his April 1, 2019, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020. Tr. 13.

2. The claimant has not engaged in substantial gainful activity since August 19, 2015, the alleged onset date. Tr. 13.

3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease status post three surgeries; lumbar radiculopathy; left trochanteric bursitis; migraine headaches; and mental impairments variously described as depression, anxiety, and post-traumatic stress disorder. Tr. 13-14.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 14.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except: she can occasionally use right and left hand and foot controls. She can reach overhead with both arms occasionally, and reach in all other directions with both arms frequently, and can handle, finger and feel with both hands frequently. She can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and can occasionally balance and stoop, and kneel, crouch, or crawl. In addition, she can never work around hazards, such as at unprotected heights, or around moving mechanical parts, can never operate a commercial motor vehicle, and can never work in conditions of humidity and wetness, in extreme heat or cold, in conditions where there are concentrated vibrations, and in condition where there is concentrated exposure to dust, odors, fumes, or other pulmonary irritants. She is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line or conveyer belt work; she is limited to simple work-related decisions, and she can respond appropriately to occasional interaction with supervisors and coworkers, but with no team or tandem work with coworkers, and no interaction with the general public. Finally, she is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained. She must also change positions every 30 minutes for one to two minutes in the immediate vicinity of the workstation. Tr. 16-17.

6.     The claimant is unable to perform any past relevant work. Tr. 23.

7.     The claimant was born in 1969 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age. Tr. 23.

8.     The claimant has at least a high school education and is able to communicate in English. Tr. 23.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. Tr. 23.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 23.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 19, 2015, through the date of this decision. Tr. 24.

## V. Plaintiff's Arguments

Meyer argues that the ALJ erred at step three, when assessing Meyer's credibility, and when he determined that Meyer can perform light work. Doc. 21.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Meyer argues that the ALJ erred at step three because his decision is "based on an incomplete and highly selective discussion of the pertinent medical evidence." Doc. 21, p. 12. Specifically, she asserts that the ALJ erred when he said she only had conservative treatment for her impairments; conflated the elements of Listing 1.02 and Listing 1.04 and focused primarily on whether Meyer could ambulate effectively, which, Meyer alleges, isn't pertinent to Listing 1.04; was mistaken when he stated that imaging showed only mild exam changes; and ignored her EMG studies and physical exam findings. Doc. 21, pp. 12-15.

At step three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker*, 93 Fed. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

Meyer argues that the ALJ failed to adequately evaluate whether her lower back impairments met Listing 1.04(A). Doc. 21, p. 12. Listing 1.04 is,

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>>
>> \*\*\*
>>
>> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1.[3]

In addition to considering Listing 1.04, the ALJ considered Listing 1.02 (Major dysfunction of a joint(s) due to any cause) and Listing 1.00B (Loss of function). The relevant portion of the ALJ's step three analysis is as follows:

> [T]he claimant's spine impairments do not meet the requirements of 1.00B, 1.04, or 1.02, as imaging demonstrated only mild exam changes as discussed below. The undersigned further notes that the claimant had only conservative treatment for her impairments, the claimant did not testify that she required the use of an assistive device nor did any medical source indicate that an assistive device was necessary for the claimant to ambulate, therefore, the medical record does not support that the claimant is unable to ambulate effectively as set forth in the examples in 1.00B2b. Accordingly, the evidence fails to establish that the claimant's spine disorders meet or equal the necessary criteria for listing 1.04, 1.02 or 1.00B2b….[detailing evidence showing that the claimant could ambulate effectively].

Tr. 15.

The ALJ's statement that Meyer had "only conservative treatment for her impairments" is puzzling because Meyer had had two lumbar surgeries and a spinal cord stimulator implanted. And while the question of whether Meyer is unable to ambulate effectively is relevant to Listing 1.00B, 1.02, and 1.04C, such a requirement is not an element of 1.04A. With respect to 1.04A,

---

[3] Listing 1.04(B) involves spinal arachnoiditis, which does not apply to Meyer.

16

there is evidence in the record showing that Meyer had a neuro-anatomic distribution of pain, limitation of motion of her lumbar spine, motor loss/weakness, sensory and reflex loss, and positive straight-leg raise testing that could, potentially, evidence nerve root compression.

Defendant asserts, "The ALJ properly noted that Plaintiff's imaging did not show evidence of nerve root compression as required by Listing 1.04. Tr. 15." Doc. 24, p. 7. But the ALJ did not so note, either at step three or later in his decision. Moreover, imaging findings are not an element of 1.04A, as they are in 1.04C. Next, Defendant submits that the ALJ's failure to outline every piece of evidence he relied on at step three in concluding that Meyer did not meet or medically equal Listing 1.04 is not reversible error because "the ALJ's decision must be read as a whole, and he fully evaluated Plaintiff's impairments throughout the remainder of his decision." Doc. 24, p. 6 (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-366 (6th Cir. 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). The Court agrees that an ALJ's failure to outline every piece of evidence relied upon at step three may not be error when the ALJ fully evaluates the claimant's impairments elsewhere in the decision; however, here, the ALJ provided very little analysis elsewhere in his decision, and none that explains why he did not find Meyer to have met or equaled Listing 1.04A.

In sum, the ALJ's step three analysis is incomplete and remand is warranted for further consideration. *See Brock v. Colvin*, 125 F.Supp.3d 671 (N.D.Oh. 2015) (reversing because the ALJ provided only a conclusory statement that the claimant did not meet Listing 1.04; "The Sixth Circuit does not require a heightened articulation standard from the ALJ at Step Three of the sequential evaluation process. But the court of appeals has made clear the step-three reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review." (internal quotation marks and citations omitted)).

17

Because the Court finds that remand is warranted due to the deficiencies in the ALJ's decision at step three, the Court need not consider Meyer's remaining arguments. However, the Court notes that Meyer's argument that the ALJ's RFC is internally inconsistent is misplaced. Meyer asserts that the ability to occasionally balance is contrary to an ability to stand and/or walk for 6 out of 8 hours in a workday because standing and walking necessarily involves balancing. But according to the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, p. 613 (U.S. Dept. of Labor, 1993), balancing is defined as "Maintaining body equilibrium to prevent falling when walking, standing, crouching, or running *on narrow, slippery, or erratically moving surfaces*; or maintaining body equilibrium when performing gymnastic feats." (emphasis supplied). Thus, the ability to balance as defined above is not implicated when standing and walking on regular surfaces.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for proceedings consistent with this opinion.[4]

IT IS SO ORDERED.

Dated: April 1, 2021

/s/Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge

---

[4] This opinion should not be construed as a recommendation that, on remand, Meyer be found disabled.

18